**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| BOROUGH OF HOPATCONG, NEW JERSEY, | ) ) ) | |
| Plaintiff, | ) ) | |
| | ) | CIVIL ACTION NO. _____ |
| v. | ) ) | Judge _____ |
| | ) | |
| 3M COMPANY (f/k/a Minnesota Mining and Manufacturing, Co.). | ) ) | **COMPLAINT AND DEMAND FOR JURY TRIAL** |
| Defendant. | ) ) ) | |

Plaintiff, Borough of Hopatcong, New Jersey, by its undersigned attorneys, alleges upon information and belief, as follows:

## I.    NATURE OF THE ACTION

1.      Plaintiff, Borough of Hopatcong, New Jersey ("Plaintiff" or "Hopatcong"), brings this action for damages arising from the intentional, knowing, reckless and/or negligent acts and/or omissions of Defendant in connection with the contamination of Plaintiff's public drinking water supply with the toxic substances PFOS (perfluorooctanesulfonic acid) and PFOA (perfluorooctanoic acid) which fall within a class of substances known as per- and polyfluoroalkyl substances ("PFAS")

2.      Defendant in this action is a major chemical company that manufactured PFOS and PFOA and knew or reasonably should have known that these harmful compounds would reach groundwater, pollute drinking water supplies, render drinking water unusable and unsafe, and threaten the public health and welfare, as it has done with respect to Plaintiff's water supply.

3.      Defendant, 3M Company ("3M") marketed, developed, manufactured, distributed released, trained users of, produced instructional materials for, sold and/or otherwise handled and/or used PFAS in such a way as to result in the contamination of Plaintiff's public drinking water supplies.

4.      3M knew or should have known that PFAS is a toxin and is persistent when released into the environment and presents significant risks to groundwater, drinking water supplies and human health.

5.      3M marketed and sold PFAS with the knowledge that PFAS would be released into the environment and without warning users or others of the risks of PFAS to the environment and to human health.

6.      As described throughout Plaintiff's complaint, Defendant's acts and/or omissions were done maliciously or with knowledge of a high degree of probability of harm and reckless indifference to the consequences to persons such as Plaintiff who foreseeably might be harmed by Defendant's acts and/or omissions.

7.      Through this action, Plaintiff seeks compensatory damages for the damage to its property, for the costs to investigate, remediate, and monitor PFAS contamination in its public drinking water supplies and the costs to investigate, design, construct, operate and maintain water treatment systems necessary to properly filter and/or treat PFAS from Hopatcong's drinking water supplies, as well as punitive damages and reasonable attorneys' fees and costs.

## II.      JURISDICTION AND VENUE

8.      This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332.

9.      This Court has jurisdiction over the Defendant because, based on information and belief, it is a corporation or other business that has sufficient minimum contacts in New Jersey or otherwise intentionally avails or availed itself of the New Jersey market either through the

distribution or sale of products containing PFOA and/or PFOS in the State of New Jersey or by having a manufacturing, distribution or other facility located in New Jersey so as to render the exercise of jurisdiction over it by courts in this state consistent with traditional notions of fair play and substantial justice.

10.     Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the property that is the subject of the action is situated in this judicial district.

### III.     PARTIES

11.     Plaintiff is a Borough in Sussex County, New Jersey having its principal place of business at 111 River Styx Road, Hopatcong, NJ 07843.

12.     Hopatcong operates a public water system that serves approximately 7,000 people with approximately 2,100 residential and commercial customer connections.

13.     Plaintiff owns and operates water systems for the benefit of the public, which includes, among other elements, drinking water production wells which draw from one or more groundwater aquifers, associated pumping, storage, treatment and distribution facilities and equipment, all of which will be referred to collectively in this Complaint as Plaintiff's "Water System."

14.     Among other things, Plaintiff's Water System includes the right of Plaintiff to extract and use groundwater for drinking water supplies from its wells. Plaintiff has a significant property interest in the waters it extracts and uses from its wells. The past, present, and continuing contamination of such waters by PFOA and PFOA constitute physical injury to such waters for which Plaintiff is entitled to, and Plaintiff hereby does, seek damages and other appropriate relief.

15.     Defendant 3M Company (f/k/a Minnesota Mining and Manufacturing Company) ("3M") is a corporation organized and existing under the laws of the state of Delaware and does business throughout the United States, including conducting business in New Jersey.  3M has its principal place of business in St. Paul, Minnesota.

16.     3M employs approximately 37,000 people in the United States and has operations in twenty-nine U.S. states, including a plant in Flemington, New Jersey.

17.     3M is registered to do business in New Jersey.

18.     3M makes more than 60,000 products in dozens of separate product categories including some well-known products such as Post-it notes, Scotch Tape, Dobie scouring pads, Ace bandages and Thinsulate insulation.

19.     3M's 2019 sales were $32.1 billion which included significant sales in New Jersey.

20.     3M has conducted targeted and purposeful advertising in New Jersey.

21.     3M has directly and continuously sold PFOS and/or PFOA to other entities for use in New Jersey.

22.     3M was the exclusive manufacturer of PFOS in the United States prior to its phaseout in 2002.

23.     3M was the exclusive manufacturer of non-linear PFOA in the United States until it ceased PFOA production in 2002.

24.     Upon information and belief, 3M marketed, developed, manufactured, distributed released, trained users of, produced instructional materials for, sold and/or otherwise handled and/or used PFAS that is the subject of this Complaint, including in New Jersey and this District, in such a way as to result in the contamination of Plaintiff's public drinking water supplies.

## IV.    FACTUAL ALLEGATIONS

25.    PFAS are a family of chemical compounds containing fluorine and carbon atoms.

26.    PFAS have been used for decades in industrial settings and also in the production of household and commercial products that are heat resistant, stain resistant, long lasting, and water and oil repellant.

27.    The PFAS family of chemicals are entirely human-made and do not exist in nature.

28.    PFOA and PFOS have characteristics that cause extensive and persistent environmental contamination.

29.    Specifically, PFOA and PFOS are persistent, toxic, and bioaccumulative as well as mobile.

30.    PFOA and PFOS are mobile; in that, they are soluble and do not easily adsorb (stick) to soil particles.

31.    PFOA and PFOS are readily transported through the air as well as the soil and into groundwater where they can migrate long distances.

32.    PFOA and PFOS are persistent in that they do not readily biodegrade or chemically degrade in the environment or in conventional treatment systems for drinking water or wastewater.

33.    PFOA and PFOS are thermally, chemically, and biologically stable in the environment and resistant to biodegradation, atmospheric photo-oxidation, direct photolysis, and hydrolysis.

34.    These compounds resist natural degradation and are difficult and costly to remove from soil and water.

35.     Exposure to certain PFAS has been associated with several negative health outcomes in both humans and animals, including but not limited to:

- Altered growth, learning and behavior of infants and older children;
- Lowering a woman's chance of getting pregnant;
- Interference with the body's natural hormones;
- Increased cholesterol levels;
- Modulation of the immune system;
- Increased risk of certain cancers; and
- Increased risk of ulcerative colitis.

36.     Contamination from PFOA and PFOS presents a threat to public health.

37.     Releases of PFOA and PFOA to land, air and water from industrial sites are known pathways to the environment.

38.     PFOA and PFOS may also enter the environment when released from PFAS-containing consumer and commercial products during their use and disposal.

39.     Biosolids from sludge at wastewater treatment plants and septage from septic systems are often used as soil or soil additives either directly from a wastewater treatment plant at agricultural sites or in the production of potting soil and similar products commercially available from wholesale or retail sources.

40.     Defendant has known of health and environmental risks associated with PFAS compounds for decades.

41.     Defendant's manufacture, distribution and/or sale of PFOA and PFOS and/or products that contain PFOA and PFOS resulted in the release of PFOA and PFOS into the environment.

42.     Through its involvement and/or participation in the creation of consumer or other commercial products and materials and related training and instructional materials and activities,

Defendant knew, foresaw, and/or should have known and/or foreseen that PFOA and PFOS would contaminate the environment.

43.     Defendant was and/or should have been aware, knew and/or should have known, and/or foresaw and/or should have foreseen that its marketing, development, manufacture, distribution, release, training of users of, production of instructional materials about, sale and/or use of PFOA and PFOS and products containing PFOA and/or PFOS, including in New Jersey, would result in the contamination of the Plaintiff's wells and the groundwater that supplies those wells.

44.     Defendant's products were unreasonably dangerous, and Defendant failed to warn of this danger.

45.     For most of the past seven decades through the early 2000s, 3M was the primary manufacturer of PFAS chemistry in the United States.

46.     3M was the only known manufacturer of PFOS and its precursors in the United States.

47.     3M began producing PFOA and PFOS as raw materials or ingredients that it used to produce other products, or that it sold to third parties for use in other products.

48.     3M produced PFAS by electrochemical fluorination beginning in the 1940s.

49.     This process results in a product that contains and/or breaks down into compounds containing PFOA and PFOS.

50.     3M went on to market PFAS and products containing PFAS, and it shipped PFAS to manufacturers throughout the United States, including in New Jersey.

51.     In the 1950s, based on its own internal studies, 3M concluded that PFAS are "toxic."

52.     3M knew as early as the mid-1950s that PFAS bioaccumulate in humans and animals.

53.     By the early 1960s, 3M understood that some PFAS are stable and persist in the environment and that they do not degrade.

54.     3M knew as early as 1960 that chemical wastes from its PFAS manufacturing facilities that were dumped to landfills could leach into groundwater and otherwise enter the environment. An internal memo from 1960 described 3M's understanding that such wastes "[would] eventually reach the water table and pollute domestic wells."

55.     As early as 1963, 3M was aware that its PFAS products were stable in the environment and would not degrade after disposal.

56.     3M began monitoring the blood of its employees for PFAS, as early as 1976, because 3M was concerned about health effects of PFAS.

57.     3M documents from 1977 relating to these worker tests further confirm that PFAS bioaccumulate.

58.     By at least 1970, 3M was aware that its PFAS products were hazardous to marine life.

59.     One study of 3M's PFAS around this time had to be abandoned to avoid severe local pollution of nearby surface waters.

60.     In 1975, 3M found there was a "universal presence" of PFOA in human blood serum samples taken from across the United States.

61.     Since PFOA is not naturally occurring, this finding reasonably should have alerted 3M to the likelihood that its products were a source of this PFOA—a possibility that 3M considered internally but did not share outside the company.

62.     This finding also should have alerted 3M to the likelihood that PFOA is mobile, persistent, bioaccumulative, and biomagnifying, as those characteristics would explain the presence of PFOA in blood from 3M's products.

63.     Other studies by 3M in 1978 showed that PFOA and PFOS are toxic to monkeys.

64.     In the late 1970s, 3M studied the fate and transport characteristics of PFOS in the environment, including in surface water and biota.

65.     A 1979 report drew a direct line between effluent from 3M's Decatur, Alabama plant and PFAS bioaccumulating in fish tissue taken from the Tennessee River.

66.     3M resisted calls from its own ecotoxicologists going back to 1979 to perform an ecological risk assessment on PFOS and similar chemicals.

67.     3M's own ecotoxicologists continued raising concerns to 3M until at least 1999.

68.     In 1983, 3M scientists opined that concerns about PFAS "give rise to legitimate questions about the persistence, accumulation potential, and ecotoxicity of [PFAS] in the environment."

69.     In 1984, 3M's internal analyses demonstrated that PFAS were likely bioaccumulating in 3M's fluorochemical employees.

70.     3M's own employees recognized that 3M was concealing known dangers relating to PFAS. For example, in a 1999 resignation letter, an employee stated that "I can no longer participate in the process that 3M has established for the management of [PFAS.] For me, it is unethical to be concerned with markets, legal defensibility and image over environmental safety."

71.     In response to pressure from the U.S. Environmental Protection Agency ("EPA"), 3M began to phase out production of PFOS and PFOA products in 2000.

72.     On May 16, 2000, 3M issued a news release asserting that "our products are safe," citing the company's "principles of responsible environmental management" as the reason to cease production.

73.     On the same day as 3M's phase out announcement, an EPA press release stated: "3M data supplied to EPA indicated that these chemicals are very persistent in the environment, have a strong tendency to accumulate in human and animal tissues and could potentially pose a risk to human health and the environment over the long term."

74.     In a memo explaining its decision, EPA stated that PFOS "appears to combine Persistence, Bioaccumulation, and Toxicity property to an extraordinary degree."

75.     3M knew or should have known that in their intended and/or common use, products containing PFAS would very likely injure and/or threaten public health and the environment in New Jersey.

76.     Despite overwhelming studies to the contrary, 3M, to this day, publicly claims that "[w]e do not believe that PFOS and PFOA cause harm to human health at levels that are typically found in the environment" and that "[w]e do not believe there is a public health issue related to PFOA and PFOS."

77.     3M knew or should have known that in their intended and/or common use, products containing PFAS would very likely injure and/or threaten public health and the environment in New Jersey.

78.     At all relevant times, Defendant, through its acts and/or omissions, concealed and/or withheld information from its customers, governmental entities, and the public that would have properly and fully alerted Plaintiff about the possible toxicological and other risks from having any PFAS in its drinking water supplies resulting in direct harm to Plaintiff.

79.     At all relevant times, Defendant encouraged the continued and/or the increased use and release into the environment of PFAS, including into New Jersey and this District, by its customers and others despite knowledge of the toxicity, persistence, and bioaccumulation concerns associated with such activities.

80.     Once governmental entities and regulators began learning of the potential toxicity, persistence, and bioaccumulation concerns associated with PFAS, Defendant cited to the pervasive use of such PFAS throughout numerous sectors of the American economy (which it had intentionally and purposefully encouraged and created) and the widespread presence of PFAS in blood of Americans (which it also had negligently, recklessly, and/or intentionally caused) as an excuse and/or reason not to restrict or regulate PFAS, essentially arguing that the issues associated with PFAS had become "too big to regulate."

81.     To this day, Defendant denies that the presence of any PFAS in any individual's blood, at any level, is an injury or presents any harm or risk of harm of any kind, or is otherwise of any legal, toxicological, or medical significance.

82.     Defendant was and/or should have been aware, knew and/or should have known, and/or foresaw or should have foreseen that its marketing, development, manufacture, distribution, release, training of users of, production of instructional materials about, sale and/or other handling and/or use of PFAS and PFAS containing materials, including in New Jersey and this District, would result in the contamination of groundwater including groundwater used by Plaintiff as its public drinking water supply.

83.     Defendant was and/or should have been aware, or knew and/or should have known, and/or foresaw or should have foreseen that allowing PFAS materials to contaminate the environment would cause injury to Plaintiff.

84.     Upon information and belief, Defendant's instructions, labels and material safety data sheets, if any, that were provided with PFAS or PFAS containing products, did not fully describe the environmental hazards of PFAS of which Defendant knew or should have known.

85.     Throughout the 1950s, 3M's own internal animal studies consistently concluded that PFAS are "toxic."

86.     A 1956 study at Stanford University, of which 3M was or should have been contemporaneously aware, concluded that PFAS manufactured by 3M bind to proteins in blood.

87.     3M knew as early as the mid-1950s that PFAS accumulate in humans and animals.

88.     By the early 1960s, 3M understood that PFAS are stable and persist in the environment and that they do not degrade.

89.     According to a deposition transcript from a lawsuit brought by the State of Minnesota against 3M (No. 27-cv-10-28862 (4th Judicial Dist. Ct. Hennepin Cty.)) ("Minn. Lawsuit") for damages to the state's natural resources from PFAS, 3M began monitoring the blood of its employees for PFAS as early as 1976 because the company was "concerned" about "health" effects of PFAS.  3M documents from 1977 relating to these worker tests further confirmed that PFAS bioaccumulate.

90.     A 1978 study by 3M on PFAS confirmed that "these chemicals are likely to persist in the environment for extended periods unaltered by microbial catabolism."

91.     Studies undertaken by 3M in the 1970s demonstrated that PFAS were even "more toxic than was previously believed."

92.     A technical journal in 1970 observed after conducting tests on a 3M product containing PFAS that the product was "highly derogatory to marine life and the entire test

program had to be abandoned to avoid severe local stream pollution."

93.     In 1979, a 3M scientist recognized in interoffice correspondence that serious harm could result from PFAS in the form of cancer because they are "known to persist for a long time in the body and thereby give long-term chronic exposure."

94.     Despite Defendant's specific knowledge of the dangers and serious harm that could result from the continued use, manufacture, marketing and distribution of PFAS, Defendant failed to provide this information to federal or state regulators, the general public or Plaintiff.

95.     According to the Minnesota Attorney General's allegations in the Minn. Lawsuit, despite 3M's understanding of the risks associated with PFAS, 3M engaged in a campaign to distort scientific research concerning PFAS and to suppress research into the potential harms associated with PFAS.

96.     According to a deposition transcript from the Minn. Lawsuit, 3M recognized that if the public and governmental regulators became aware of the risks associated with PFAS, 3M would be forced to halt its manufacturing of PFAS and PFAS-derived products that would result in the loss of hundreds of millions of dollars in annual revenue.

97.     The potential loss of 3M's massive profits from PFAS drove 3M to engage in a campaign to influence the science relating to PFAS and, according to internal 3M documents, to conduct scientific "research" that it could use to mount "[d]efensive [b]arriers to [l]itigation."

98.     A key priority of an internal 3M committee—referred to as the FC Core Team—was to "[c]ommand the science" concerning "exposure, analytical, fate, effects, human health and ecological" risks posed by PFAS and for 3M to provide "[s]elective funding of outside research through 3M 'grant' money."

99.    In exchange for providing grant money to friendly researchers, 3M obtained the right to review and edit draft scientific papers regarding PFAS and sought control over when and whether the results of scientific studies were published at all.

100.    A significant aspect of 3M's campaign to influence independent scientific research involved 3M's relationship with Professor John Giesy.  3M provided millions of dollars in grants to Professor Giesy, who presented himself publicly as an independent expert but, as revealed in his deposition transcript from the Minn. Lawsuit, privately characterized himself as part of the 3M "team."

101.    According to Professor Giesy's deposition transcript in the Minn. Lawsuit, he worked on behalf of 3M to "buy favors" from scientists in the field for the purpose of entering into a "quid pro quo" with the scientists.

102.    According to emails produced by Professor Giesy in the Minn. Lawsuit, through his position as an editor of academic journals, Professor Giesy reviewed "about half of the papers published in the area" of PFAS ecotoxicology and billed 3M for his time reviewing the articles and, in performing reviews of these articles, Professor Giesy stated that he was always careful to ensure that there was "no paper trail to 3M" and that his goal was to "keep 'bad' papers [regarding PFAS] out of the literature" because "in litigation situations" those articles "can be a large obstacle to refute."

103.    According to Professor Giesy's deposition transcript from the Minn. Lawsuit, despite spending most of his career as a professor at public universities, Professor Giesy has a net worth of approximately $20 million which is, according to the Minnesota Attorney General, in part a direct result from his long-term involvement with 3M for the purpose of suppressing independent scientific research on PFAS.

104.    Defendant's manipulation and suppression of scientific research directly harmed Plaintiff because it prohibited governmental agencies from obtaining the necessary information to properly regulate (or ban) Defendant's PFAS.

105.    Under pressure from the EPA, on May 16, 2000, 3M announced it would phase out production of PFOS and PFOA, in part, because of the chemicals' biopersistence.

106.    3M ceased production of PFOS and PFOA in 2002.

107.    An EPA internal memo on the day of 3M's phase-out announcement stated: "3M data supplied to EPA indicated that these chemicals are very persistent in the environment, have a strong tendency to accumulate in human and animal tissues and could potentially pose a risk to human health and the environment over the long term . . . .  *[PFAS] appears to combine Persistence, Bioaccumulation, and Toxicity properties to an extraordinary degree*." (emphasis added).

108.    As described throughout Plaintiff's complaint, Defendant's acts and/or omissions were accompanied by a wanton and willful disregard of persons such as Plaintiff who foreseeably might be harmed by Defendant's acts and/or omissions.

109.    As described throughout Plaintiff's complaint, Defendant's acts and/or omissions were done maliciously or with knowledge of a high degree of probability of harm and reckless indifference to the consequences to persons such as Plaintiff who foreseeably might be harmed by Defendant's acts and/or omissions.

110.    May 25, 2016, EPA issued a Notice of its revised lifetime health advisory for PFOS and PFOA as follows: "0.07 parts per billion (70 parts per trillion "ppt") for PFOS and PFOA.  Because these two chemicals cause similar types of adverse health effects, EPA

recommends that when both PFOS and PFOA are found in drinking water the combined concentrations of PFOS and PFOA be compared with the 0.07 part per billion HA level."

111.    On November 1, 2017, the New Jersey Department of Environmental Protection ("DEP") announced that it would set a maximum contaminant level ("MCL") for PFOA in drinking water of 14 ppt.  An MCL is the legal threshold limit on the amount of a substance that is allowed in public water systems under the New Jersey Safe Drinking Water Act.

112.    On June 8, 2018, DEP recommended an MCL for PFOS in drinking water of 13 ppt.

113.    On June 1, 2020, DEP officially published (52 N.J.R. 1165(b)) an MCL of 14 ppt for PFOA and 13 ppt for PFOS.  The rule requires all water systems, including Plaintiff, to monitor PFOA and PFOS within the first quarter of 2021.

114.    Plaintiff currently has seven wells that contain PFOS and PFOA.

115.    Five of Plaintiff's wells contain levels of PFOA and PFOS that are above the New Jersey's MCL.

## FIRST CLAIM FOR RELIEF
### (Negligence)

116.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

117.    Defendant had a duty to exercise reasonable care in its design, engineering, manufacture, development, fabrication, testing, release, training of users of, production of informational materials about, handling, selling, use, and/or distribution of PFAS, including a duty of care to ensure that PFAS did not pollute the environment thereby contaminating Plaintiff's public drinking water supply.

118.     Defendant owed a duty of care towards Plaintiff that was commensurate with the inherently dangerous, harmful, injurious, environmentally-persistent, toxic, and bio-accumulative nature of PFAS.

119.     Defendant failed to exercise ordinary care by acts and/or omissions that permitted, allowed, and/or otherwise resulted in the contamination of Plaintiff's public drinking water supply with PFAS, including all such acts and/or omissions referenced in this Complaint.

120.     Defendant knew, foresaw, anticipated, and/or should have foreseen, anticipated, and/or known that the design, engineering, manufacture, fabrication, sale, release, training of users of, production of informational materials about, handling, use, and/or distribution of PFAS and/or other acts and/or omissions as described in this Complaint could likely result in the contamination of Plaintiff's public drinking water supply.

121.     Despite knowing, anticipating, and/or foreseeing the bio-persistent, bio-accumulative, toxic, and/or otherwise harmful and/or injurious nature of PFAS, Defendant, its agents, servants, and/or employees, committed negligent acts and/or omissions that resulted in the contamination of Plaintiff's public drinking water supply with PFAS.

122.     Defendant, through its and/or omissions as described in this Complaint, breached its duty to Plaintiff.

123.     It was reasonably foreseeable to Defendant that Plaintiff would likely suffer the injuries and harm described in this Complaint by virtue of Defendant's breach of its duty and failure to exercise ordinary care, as described herein.

124.     But for Defendant's negligent acts and/or omissions, Plaintiff would not have been injured or harmed.

125.    Defendant's negligent conduct was the direct and proximate cause of the injuries and harm to Plaintiff as described herein.  Furthermore, as described throughout Plaintiff's complaint, Defendant's acts and/or omissions were also done maliciously or with knowledge of a high degree of probability of harm and reckless indifference to the consequences to persons such as Plaintiff who foreseeably might be harmed by Defendant's acts and/or omissions.

126.    As a direct and proximate result of Defendant's negligent conduct, Plaintiff has suffered, and continues to suffer, property damage requiring investigation, remediation, treatment and monitoring costs to be determined at trial.

### SECOND CLAIM FOR RELIEF
#### (Common Law Negligent Failure to Warn)

127.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

128.    Defendant had a duty to exercise reasonable care in its design, engineering, manufacture, development, fabrication, testing, release, training of users of, production of informational materials about, handling, selling, use, and/or distribution of PFAS, including a duty of care to not only ensure that PFAS did not pollute the environment thereby contaminating Plaintiff's public drinking water supply but also a duty to warn Plaintiff of the dangers associated with PFAS.

129.    Defendant owed a duty to warn Plaintiff of the dangers associated with PFAS that was commensurate with the inherently dangerous, harmful, injurious, environmentally-persistent, toxic, and bio-accumulative nature of the chemical.

130.    Defendant's failure to warn permitted, allowed, and/or otherwise resulted in the contamination of Plaintiff's public drinking water supply with PFAS.

131.     Defendant knew, foresaw, anticipated, and/or should have foreseen, anticipated, and/or known that the design, engineering, manufacture, fabrication, sale, release, training of users of, production of informational materials about, handling, use, and/or distribution of PFAS and/or other acts and/or omissions as described in this Complaint could likely result in the contamination of Plaintiff's public drinking water supply and had a duty to warn Plaintiff of this danger.

132.     Despite knowing, anticipating, and/or foreseeing the bio-persistent, bio-accumulative, toxic, and/or otherwise harmful and/or injurious nature of PFAS, Defendant, its agents, servants, and/or employees, failed to warn Plaintiff of the dangers associated with PFAS.

133.     Defendant, through its and/or omissions as described in this Complaint, breached its duty by failing to warn Plaintiff of the dangers associated with PFAS.

134.     It was reasonably foreseeable to Defendant that Plaintiff would likely suffer the injuries and harm described in this Complaint by virtue of Defendant's breach of its duty to warn.

135.     But for Defendant's negligent failure to warn, Plaintiff would not have been injured or harmed.  Furthermore, as described throughout Plaintiff's complaint, Defendant's acts and/or omissions were also done maliciously or with knowledge of a high degree of probability of harm and reckless indifference to the consequences to persons such as Plaintiff who foreseeably might be harmed by Defendant's acts and/or omissions.

136.     Defendant's negligent conduct was the direct and proximate cause of the injuries and harm to Plaintiff as described herein.

137.    As a direct and proximate result of Defendant's failure to warn, Plaintiff has suffered, and continues to suffer, property damage requiring investigation, remediation, treatment and monitoring costs to be determined at trial.

## THIRD CLAIM FOR RELIEF
### (Common Law Strict Liability Failure to Warn)

138.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

139.    During the time periods that Defendant manufactured, used and/or distributed PFAS, Defendant knew of the risks associated with PFAS including that PFAS were toxic, bioaccumulate in the environment, are water soluble and can migrate readily from soil to groundwater, where they can be transported long distances.

140.    As a manufacturer of PFAS and PFAS-containing products, Defendant had a duty to provide adequate warnings to Plaintiff and the public of the risks posed by PFAS.

141.    Defendant knew of the risks associated with PFAS and failed to provide a warning that would lead an ordinary reasonable user or handlers of PFAS to contemplate the dangers associated with PFAS or an instruction that would have allowed Plaintiff to avoid damage to its property.

142.    Despite Defendant's knowledge of the dangers associated with PFAS, Defendant did not issue adequate warnings to Plaintiff, communities or governmental agencies relating to the dangers PFAS posed to drinking water supplies.  Furthermore, as described throughout Plaintiff's complaint, Defendant's acts and/or omissions were also done maliciously or with knowledge of a high degree of probability of harm and reckless indifference to the consequences to persons such as Plaintiff who foreseeably might be harmed by Defendant's acts and/or omissions.

143.    Plaintiffs and others would have heeded legally adequate warnings and would have taken steps to ensure that PFAS were not used in a manner that would result in contamination of public drinking water supplies.

144.    Defendant's PFAS were unsafe because a warning could have made them safer at virtually no added cost and without limiting their availability.

145.    As a direct and proximate result of Defendant's failure to warn, Plaintiff has suffered, and continues to suffer, property damage requiring investigation, remediation, treatment and monitoring costs to be determined at trial.

### FOURTH CLAIM FOR RELIEF
### (Public and Private Nuisance)

146.    Plaintiff repeats and restates the allegations set forth in all the previous paragraphs of this Complaint as if fully set forth herein.

147.    Plaintiff is the owner of land, easements and water rights which permit it to extract groundwater for use in its Water System.

148.    The actions of the Defendant as alleged herein, has resulted in the continuing contamination of Plaintiff's Contaminated Wells and the groundwaters that supply them by PFOA and PFOS, and constitutes a nuisance. Defendant has caused, maintained, assisted and/or participated in such nuisance, and is a substantial contributor to such nuisance.

149.    The actions of the Defendant constitutes a nuisance in that the contamination of groundwater and drinking water is injurious to public health, is indecent or offensive to the senses and is an obstruction to the Plaintiff's free use of its property, so as to interfere with the comfortable enjoyment of life or property. The contamination of the groundwater and public drinking water supply significantly affects, at the same time, a considerable number of people in an entire community.

150.    By its design, Defendant's PFOA and PFOS, and products containing PFOA and PFOS, are known by Defendant to contain compounds will likely be discharged to the environment in a manner that will create a nuisance and further failed to properly instruct intermediaries and end-users to properly use and dispose of such contaminants in such a manner that not create or contribute to the creation of a nuisance.

151.    Defendant knew, or should have known, of the harmful effects and adverse impacts that exposure to PFOA and/or PFOS would have on the environment and human health.

152.    Defendant caused or contributed to the creation of the nuisance at issue by directing and instructing intermediaries and end users of its products to dispose of products and materials containing PFOA and PFOS in a manner that Defendant knew or should have known would result in the contamination of soil and groundwater and ultimately impact drinking water.

153.    As a direct and proximate result of the Defendant's acts and omissions as alleged herein, Plaintiff's Contaminated Wells and the groundwaters that supply them have been, and continue to be, contaminated with PFOA and PFOS, causing Plaintiff significant injury and damage. As a direct and proximate result of these Defendant's acts and omissions as alleged herein, Plaintiff has incurred, is incurring, and will continue to incur, investigation, treatment, remediation and monitoring costs and expenses related to the PFOA and PFOS contamination of Plaintiff's Contaminated Wells in an amount to be proved at trial.

154.    As a direct and proximate result of the Defendant's acts and omissions as alleged herein, the contamination of groundwater and drinking water supplies constitutes an ongoing public nuisance. Defendant is responsible to take such action as is necessary to abate the public nuisance and to take such action as is necessary to ensure that the PFOA and PFOS that

contaminate the aquifers supplying water to the Plaintiff's Water System do not present a risk to the public.

155.    Plaintiff has been specially damaged because Defendant's acts and omissions, have unreasonably interfered with, and continue to interfere with, Plaintiff's use and enjoyment of its public water supply systems and has suffered and continues to suffer significant damages and injuries, including but not limited to, incurring costs related to the investigation, sampling, treatment system design, acquisition, installation, operations and maintenance, and other costs and damages related to the detection and remediation of the PFAS contamination of its water supply systems.

156.    Defendant knew and/or should have known that it was substantially certain that their alleged acts and omissions described in this Complaint would cause injury and damage, including contamination of drinking water supplies with PFOA and PFOA. Defendant committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice.  Furthermore, as described throughout Plaintiff's complaint, Defendant's acts and/or omissions were also done maliciously or with knowledge of a high degree of probability of harm and reckless indifference to the consequences to persons such as Plaintiff who foreseeably might be harmed by Defendant's acts and/or omissions.  Such conduct was performed to promote sales of PFOA, PFOS and/or products that contain PFOA and/or PFOS and maximize profits, in conscious disregard of the probable dangerous consequences of that conduct and its foreseeable impact upon health, property and the environment, including Plaintiff's Water System. Therefore, Plaintiff also requests an award of exemplary damages in an amount that is sufficient to punish Defendant and that fairly reflects the aggravating circumstances alleged herein.

## FIFTH CLAIM FOR RELIEF
### (Past and Continuing Trespass)

157.    Plaintiff incorporates herein the allegations contained in all prior paragraphs of this Complaint as if fully restated herein.

158.    Defendant's intentional and/or reckless acts and/or omissions have resulted and/or continue to result in the unlawful release and/or threatened release of PFAS under, onto, and/or into Plaintiff's public drinking water supply.

159.    The PFAS present in Plaintiff's public drinking water supply were at all relevant times hereto, and continue to be, the property of Defendant.

160.    The invasion and presence of the PFAS in Plaintiff's public drinking water supply was and continues to be without permission or authority from Plaintiff.

161.    The presence and continuing presence of PFAS in Plaintiff's public drinking water supply constitutes a continuing trespass.

162.    Defendant's past and continuing trespass upon Plaintiff's public drinking water supply has proximately caused and/or continues to proximately cause damage to Plaintiff in the form of property damage, for which Defendant is liable.  Furthermore, as described throughout Plaintiff's complaint, Defendant's acts and/or omissions were also done maliciously or with knowledge of a high degree of probability of harm and reckless indifference to the consequences to persons such as Plaintiff who foreseeably might be harmed by Defendant's acts and/or omissions.

163.    As a direct and proximate result of Defendant's actions and inactions, Plaintiff has suffered, and continues to suffer, property damage requiring investigation, remediation, treatment and monitoring costs to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendant as follows:

A.      Enter judgment in its favor and against Defendant on each Count of this Complaint;

B.      An order that Defendant pay all damages suffered by Plaintiff, including but not limited to investigation, clean-up, abatement, remediation, engineering, treatment and monitoring costs incurred by Plaintiff, or for which Plaintiff is or was legally responsible, to comply with the EPA's public health advisories and the state's soil and groundwater cleanup standards and drinking water standards and criteria;

C.      An award to Plaintiff for the costs of this suit (including but not limited to expert fees) and reasonable attorneys' fees, as provided by law;

D.      An award for punitive damages; and

E.      An award for such other and further relief as the nature of this case may require or as this court deems just, equitable and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a jury trial.


HOPATCONG WATER COMPANY,
By Their Attorneys,

*/s/ Michael London*
Michael London (NJ Bar # 048501997)
Rebecca Newman (NJ Bar # 033202008)
DOUGLAS & LONDON, P.C.
59 Maiden Lane, 6th Floor
New York, NY 10038
Tel. (212-566-7500
Fax (212) 566-7501

Richard W. Head (NH Bar # 7900)
Of Counsel

SL ENVIRONMENTAL LAW GROUP PC
201 Filbert Street, Suite 401
San Francisco, CA 94133
Tel. (415) 348-8300
Fax (415) 384-8333
rhead@slenvironment.com

Kevin J. Madonna (NY Bar # 2981181)
KENNEDY & MADONNA, LLP
48 Dewitt Mills Road
Hurley, NY 12443
Tel. (845) 481-2622
Fax (845) 230-3111
kmadonna@kennedymadonna.com

Ned McWilliams (Florida Bar # 0016174)
LEVIN PAPANTONIO THOMAS
MITCHELL RAFFERTY PROCTOR, P.A.
316 S. Baylen Street
Pensacola, FL 32502
Tel. (850) 435-7138
Fax (850) 435-7020

Senator Raymond Lesniak (NJ Bar #
018051974)
530 Irvington Avenue
Livingston, NJ 07208
Tel. (862) 812-6756

DATED: September 11, 2020